STATE SURETY COMPANY, an Iowa Corporation, Appellant (One of Defendants),

v.

LAMB CONSTRUCTION COMPANY, a Wyoming corporation, Appellee (Plaintiff).

Robert F. BELL and Dorothy J. Bell, husband and wife, d/b/a BIG T Family Restaurant, Appellants (One of Defendants and Cross-Complainants),

v.

LAMB CONSTRUCTION COMPANY, a Wyoming Corporation, Appellee (Plaintiff),

and

Pinetree Builders, Inc., a Nebraska Corporation, and State Surety Company, an Iowa Corporation, Appellees (Defendants).

Nos. 5330, 5331.

Supreme Court of Wyoming.

Feb. 11, 1981.

Nick Kalokathis of Lathrop & Uchner, P. C., Cheyenne, for State Sur. Co.

Frank J. Jones, Wheatland, for Robert F. Bell and Dorothy J. Bell, husband and wife, d/b/a Big T Family Restaurant.

Dan J. Pauli of Sigler & Pauli, Torrington, for Lamb Const. Co.

No briefs or appearance for Pinetree Builders, Inc.

Before ROSE, C. J.,* and McCLINTOCK, RAPER,** THOMAS and ROONEY, JJ.

ROSE, Chief Justice.

This litigation was initiated by a subcontractor against the owners, the general contractor and the general contractor's surety company in an effort to recover payment for work performed in the construction of a restaurant building near Torrington, Wyoming.

Lamb Construction Company, subcontractor-plaintiff, filed a complaint against Robert F. Bell and Dorothy J. Bell, husband and wife, d/b/a Big T Family Restaurant, owners; Pinetree Builders, Inc., a Nebraska corporation, general contractor; and State Surety Company, an Iowa corporation, surety company.[1] State Surety and Pinetree had jointly issued a Labor and Material Payment Bond and a Performance Bond.

The original action by Lamb sought to recover $14,892.55, plus interest and attorney fees, against all of the defendants, and asked that a materialman's lien, which it had filed, be foreclosed.

The Bells filed a cross-claim against Pinetree seeking damages for delay in completing construction of the project, recovery for the costs of replacing and completing defective and nonconforming work, recovery for work not completed under the terms of the contract and for recovery of all attorney fees and costs incurred in connection with defense of the suit. They also sought recovery against State Surety under the bonds issued by the surety company.

Pinetree, in turn, filed a cross-claim against the Bells asking recovery for amounts alleged due under the terms of the original contract and for extra work performed. The Bells admitted that money was owed Lamb for paving and surfacing the parking lot, but took the position that that was Pinetree's obligation. All other claims were denied by the respective parties and the matter was submitted to trial.

* Chief Justice as of January 5, 1981.
** Chief Justice at time of oral argument.
1. Throughout this opinion, the parties will hereafter be referred to as follows:

(a) Robert F. Bell and Dorothy J. Bell, d/b/a Big T Family Restaurant ..... Bells

Lamb was awarded judgment for $14,892.55, together with interest and costs, against Pinetree and State Surety jointly, along with judgment in the sum of $4,500.00 for attorney fees against State Surety. Additionally, the court found Lamb's lien on the Bells' property to be valid and ordered it foreclosed.

Pinetree was awarded judgment against the Bells on its cross-claim in the amount of $1,531.32. According to the Amended Findings of Fact and Conclusions of Law, this figure was reached by determining that the Bells should recover $9,406.18 from Pinetree for payment of uncompleted work under the contract, and that Pinetree was entitled to recover $10,937.50 from the Bells for work performed and materials provided. The trial judge "netted" these figures and awarded Pinetree judgment against the Bells for $1,531.32. The trial court denied the Bells recovery for any attorney fees or costs. State Surety and the Bells have both perfected appeals.

The Bells identify the issues in their appeal as follows:

"1. Did the trial court err in refusing to award damages incurred by Appellants for breach of contract as a result of Pinetree not completing the contract project within the time period specified in the contract?

"2. Did the trial court err in not awarding recovery in full to Appellants for landscaping and site work which Pinetree failed to complete under the terms of the contract and which Appellants completed at their expense?

"3. Did the trial court err in denying recovery of attorney fees and costs to Appellants from Pinetree and State Surety as required by the Labor and Material Bond, Performance Bond and Section 29-2-115, Wyoming Statutes, 1977?"

(b) Pinetree Builders, Inc., a Nebraska corporation ..... Pinetree
(c) State Surety Company, an Iowa corporation ..... State Surety
(d) Lamb Construction Company, a Wyoming corporation ..... Lamb

State Surety describes the issues on appeal with which it is concerned as follows:

"1. Do the provisions of W.S. 26–15–126 extend to Surety Companies, and did the trial Court error [sic] in determining that State Surety Company was subject to the provisions of that Statute?

"2. In view of certain disputes between the Owner, General Contractor, and the Subcontractor concerning amounts due and owing among each of the foregoing, was State Surety, justified in withholding payment on its bond, pending a resolution of such disputes, and did the trial Court err in its determination that State Surety acted unreasonably, and without good cause, under W.S. 26–15–126?"

## FACTS

Pinetree, a general contractor, and the Bells, as owners, entered into an agreement, dated the 19th day of August, 1977, for the construction of a Tastee Freez building near Torrington, Wyoming.

On September 30, 1977, State Surety and Pinetree issued a Labor and Material Payment Bond and a Performance Bond, both of which named Pinetree as principal, the Bells as owners, and State Surety as surety.

The contract between the owners and the builder provided that construction was to commence immediately upon execution of the agreement, and substantial completion was to be achieved not later than 120 days thereafter. Construction was not commenced, however, until the latter part of

September, 1977, and the building was not substantially completed until approximately March 14, 1978. One hundred and twenty days after execution would have been December 17, 1977.

The contract provided, as detailed in the plans and specifications, that Pinetree would complete all "site and landscape improvements." In point of fact, Pinetree did not do the landscaping on the premises as required by the parties' agreement. At a cost to the Bells of $3,368.75, landscaping, somewhat modified from that specified in the Bells-Pinetree contract, was completed by another company and the trial court granted the Bells recovery for a portion of this amount.

## THE ISSUES CONSIDERED

We will first consider State Surety's appeal in Case No. 5330, wherein Lamb is the appellee.

### Case No. 5330

■ The first question for our resolution is framed by State Surety as follows:

### Issue No. 1

"1. Do the provisions of W.S. 26–15–126 extend to Surety Companies, and did the trial Court error [sic] in determining that State Surety Company was subject to the provisions of that Statute?"

In its brief, State Surety contends that § 26–15–126(c), W.S.1977,[2] which provides

---

**2.** Section 26–15–126, W.S.1977, entitled, "Claim to be accepted or rejected; attorney fees," provides:

"(a) Claims for benefits under a life, accident or health insurance policy shall be rejected or accepted and paid by the insurer or its agent designated to receive such claims within forty-five (45) days after receipt of the proofs of loss and supporting evidence. Exceptions to the time of forty-five (45) days shall be made for accident and health insurance claims where there is any question as to the validity or the amount of the claim and the question is referred to the Wyoming state medical peer review committee for adjudication.

"(b) Claims for benefits under a property or casualty insurance policy shall be rejected or accepted and paid by the insurer or its agent designated to receive such claims within forty-five (45) days after receipt of the claim and supporting bills.

"(c) In all actions or proceedings commenced against any insurance company on any insurance policy or certificate of any type or kind of insurance, or in any case where an insurer is obligated by a liability insurance policy to defend any suit or claim or pay any judgment on behalf of a named insured, if it is determined that the company has refused to pay the full amount of a loss covered by the policy and that the refusal is unreasonable or without cause, any court in

that an "insurance company" is obligated to pay any judgment or defend any suit where coverage exists, does not apply because a surety company is not an insurance company within the meaning of the statute. We cannot agree.

First, we are in disagreement with State Surety's contention that this is a penal statute which requires narrow construction. The policy behind this statute is not to penalize insurance companies but to encourage claim statements and to chill any tendencies upon the part of insurance companies to unreasonably reject claims. See, e. g., *Heis v. Allstate Insurance Company*, 248 Or. 636, 436 P.2d 550, 553 (1968). It has been held that such statutes are compensatory, not penal in nature. *Hagey v. Massachusetts Bonding & Ins. Co.*, 169 Or. 132, 127 P.2d 346, 347 (1942); *Wolf v. Mutual Benefit Health and Accident Ass'n*, 188 Kan. 694, 366 P.2d 219, 226 (1961). In *Schweigert v. Beneficial Standard Life Insurance Co.*, 204 Or. 294, 282 P.2d 621, 626–627 (1955), it is said that the purpose of such statutes is to " 'protect an insured who has suffered a loss from annoying and expensive litigation . . .' " But even a narrow construction of § 26–15–126, supra, would not help State Surety.

In ascertaining whether surety is insurance within the contemplation of Wyoming statutory law pertaining to such matters, other relevant sections of the statutes must be considered. Applicable provisions of the Wyoming Insurance Code, § 26–1–101, et seq., 1977, establish that surety contracts are treated as a type of insurance and, therefore, are included under § 26–15–126(c), supra.

"§ 26–1–102. 'Insurance' defined.

"Insurance is a contract whereby one undertakes to indemnify . . . or to pay or allow a specified amount or determinable benefit in connection with ascertainable risk contingencies."

"§ 26–1–103. 'Insurer' defined.

" 'Insurer' includes every person engaged as indemnitor, *surety*, or contractor in the business of entering into contracts of insurance or of annuity." (Emphasis added.)

"§ 26–5–105. 'Surety *insurance*' defined.

"(a) Surety insurance includes:

\* \* \* \* \* \*

"(ii) Insurance guaranteeing the performance of contracts, other than insurance policies, and guaranteeing and executing bonds, undertakings, and contracts of suretyship;" (Emphasis added.)

"§ 26–15–102. 'Policy' defined.

" 'Policy' means the written contract of or written agreement for or effecting insurance, by whatever name called, . . ."

Section 26–4–101(a)(v)(A), W.S.1977, provides that the insurance commissioner shall collect fees from "surety" agents or a "surety insurer."

Section 26–9–103(a)(iii), W.S.1977, defines a "general lines" agent as one who transacts enumerated "kinds of insurance," including "[s]urety insurance."

Section 26–14–105, W.S.1977, provides guidelines for "surety insurance" rates.

Section 26–14–107(a), W.S.1977, provides that insurers shall file with the commissioner a manual of classification as to "surety insurance."

Section 26–15–101, W.S.1977, provides that Chapter 15 of the Code, which includes § 26–15–126(c), supra, shall apply to all insurance contracts other than "(i) [r]einsurance; (ii) [p]olicies or contracts not issued for delivery in this state nor delivered in this state; (iii) [w]et marine and transportation insurance"—but does not exclude coverage of surety insurance.

Finally, § 26–27–101, W.S.1977, *specifically provides* that contracts of "surety insurance" are subject to the applicable provisions of Chapter 15 of the Wyoming Insurance Code, which includes § 26–15–126(c), supra. We conclude that the above statutes

which judgment is rendered for a claimant may also award a reasonable sum as an attorney's fee and interest at ten percent (10%) per year."

are unambiguous in providing that § 26–15–126(c) applies to the bonds involved in this case.

### Issue No. 2

■ In formulating the second issue, State Surety asks:

"2. In view of certain disputes between the Owner, General Contractor, and the Subcontractor concerning amounts due and owing among each of the foregoing, was State Surety, justified in withholding payment on its bond, pending a resolution of such disputes, and did the trial Court err in its determination that State Surety acted unreasonably, and without good cause, under W.S. 26–15–126."

State Surety contends that because Lamb, Pinetree and the Bells were quarreling among themselves about amounts of materials, billings, and who owed various moneys to whom, State Surety could sit back and await the settlement of these disputes before undertaking payment to Lamb.

State Surety describes the disputes with respect to which it was awaiting resolution in the following way:

"That there was a dispute among the several contractors, is beyond question. The amount of material billed was approximately seventeen percent more material than was originally proposed. There was a discrepancy between the bid price and the final bill. There was a difference of approximately $3,000.00 between Lamb's initial proposal and the actual amount of Lamb's billing. There was a dispute between Pinetree and the owner, Bell as to who would pay this additional amount. There was an additional quarrel between the general contractor and the owner involving the owner's interference with the general contractors [sic] work and denial of access."

The relevant aspect of § 26–15–126(c), supra, provides:

"... [I]f it is determined that the company has refused to pay the full amount of a loss ... and that the *refusal is unrea-* *sonable or without cause*, any court ... may also award a reasonable sum as an attorney's fee and interest at ten percent (10%) per year." (Emphasis added.)

If the determination of whether attorney fees should be awarded is solely a question of fact, this court, of course, owes great deference to the trial court's determination of factual issues. E. g., *Quin Blair Enterprises, Inc. v. Julien Const. Co.*, Wyo., 597 P.2d 945 (1979). If the decision to award attorney fees involves solely a question of law, the situation is more complicated. We have held that the district court possesses equitable discretion to deny attorney fees even when they are provided for by contract. *Combs v. Walters*, Wyo., 518 P.2d 1254, 1255 (1974); and *Graves v. Burch*, 26 Wyo. 192, 181 P. 354, 357 (1919). On the other hand, an error of law constitutes an abuse of discretion. E. g., *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980).

In this case, Lamb's claim to entitlement of attorney fees is based on § 26–15–126(c), supra, which appears to repose discretion in the trial court because it says:

"... [I]f it is determined that the company has refused to pay the full amount of a loss covered by the policy and that the refusal is unreasonable or without cause, any court in which judgment is rendered for a claimant *may* also award a reasonable sum as an attorney's fee, ...." (Emphasis added.)

In attacking the award of attorney fees to Lamb, State Surety argues that the trial court erroneously determined that its refusal to pay was unreasonable. It does not argue that the trial court made a factual error, but urges error as a matter of law where the judge decided that the surety company wrongfully withheld payment until the underlying dispute between Pinetree and the Bells was resolved. The only case from this court, pertinent to this issue, cited by State Surety is *Commercial Union Insurance Co. v. Postin*, Wyo., 610 P.2d 984 (1980). In that case, we held that an insurance company acted as a volunteer in making a payment to its insured and therefore was not entitled to sue the alleged tort-

feasors as the insured's subrogee. State Surety argues that that decision justified its refusal to pay since, "[t]he surety could also be deemed a volunteer with no rights against the principal." We disagree. In *Commercial Union Insurance Co.*, the insurance company paid the loss even though it had concluded that the cause of the building's collapse was inherent or latent defect, which deficiencies were specifically excluded from insurance coverage. Our opinion in *Commercial Union Insurance Co.* made room for a payment "made in good faith and with the reasonable belief that it was made in order to protect [the insurer's] own interest." Id. at 990. We held, however, that this description of the payment did not fit the facts of that case.

State Surety offers no evidence that it investigated Lamb's claim in any manner before rejecting it; rather, the surety company simply insists that it had no obligation to pay until various disputes involving the general contractor, Pinetree, were settled. We are unpersuaded that the authority of *Commercial Union Insurance Co.* makes State Surety's refusal to pay in this case reasonable. Similarly, State Surety's citation of *Fireman's Fund Insurance Company v. Clark*, 253 Ark. 1025, 490 S.W.2d 447, 448 (1973), illustrates the danger of a "volunteer" payment by a surety, but also provides an exception for a payment made in "good faith." Again, *Fireman's Fund Insurance Company* does not demonstrate that State Surety's reflexive refusal to pay was necessarily reasonable.

The appellant Surety Company goes on to cite *Koch v. Prudential Insurance Company of America*, 205 Kan. 561, 470 P.2d 756 (1970), in which the Supreme Court of Kansas held that the insurer should not be responsible for attorney fees incurred in contesting the company's refusal to make full payment under a policy. According to the Kansas Supreme Court,

"... [T]he proof of loss showed on its face lack of coverage on the critical issue of the insured's age. * * * Thereafter, substantial evidence was discovered corroborating the defendant's contention of

lack of coverage—the sworn statement of both the insured (the marriage license affidavit) and his spouse (her answer on request for admissions), the insured's Army discharge record, his death certificate, and the birth certificates of his children, all indicating he was too old to be covered by the policy." 205 Kan. 561, 470 P.2d at 760.

The Kansas court stated the issue of attorney fees as:

" * * * The question is, how did the matter appear before the trial as judged by a reasonable and prudent man seeking to determine the facts of the controversy *which it was his duty in good faith to investigate.*" (Emphasis added.) 205 Kan. 561, 470 P.2d at 760.

It thus appears that the mere existence of a dispute, without any attempt to investigate, does not justify the insurer in refusing to pay.

State Surety concludes its brief with a citation to *Cox v. Washington National Insurance Company*, Mo.App., 520 S.W.2d 76, 81 (1974), a case which interpreted § 375.420 RSMo 1969, V.A.M.S. The Missouri statute is like our § 26–15–126(c), supra, except that the Missouri statute also allows punitive damages, as well as an award of attorney fees for a refusal by an insurer to pay "without reasonable cause or excuse." In that case, plaintiff-appellant Cox suffered an auto accident in 1965, but returned to work the next year and worked for more than two years before concluding that the auto-accident injuries had, in fact, permanently disabled him. He subsequently sought compensation under his insurance policy, claiming that he had been permanently disabled as a result of the 1965 accident. A Missouri court of appeals held that Cox had been permanently disabled, but that he should not be entitled to damages for vexatious delay or attorney fees because the insurer declined to pay the claim. As in the Kansas case just discussed, it would appear that there was a prima facie defense, i. e., that the plaintiff's own action in returning to work for two years negated his claim that he had been permanently disabled.

Thus, even if we were to accept the applicability[3] and authority of the above cases, it appears that the sum of State Surety's accomplishment is to show that we are obligated to examine the trial judge's factual conclusion to the effect that State Surety's refusal to pay was unreasonable. In attacking the trial judge's factual conclusion, an appellant has the burden of directing our attention to those parts of the record on which he relies. Rule 5.01(3), W.R.A.P.; and *Dechert v. Christopulos*, Wyo., 604 P.2d 1039, 1044 (1980). Other than its statements that there existed disputes between Pinetree and the Bells, and Pinetree and Lamb, State Surety identifies no evidence to support its necessary and implied contention that a reasonable and prudent man would have refused to pay the claim. It is this court's judgment that State Surety's own authorities, discussed above, require that an acceptable good-faith refusal to pay must be based on more than the mere existence of disputes.

We next consider the claims made in response to the district court's holding for Pinetree on the cross-claims of the Bells.

### Case No. 5331
### Issue No. 1

■ The first issue framed by appellants-Bells is:

"Did the trial court err in refusing to award damages incurred by Appellants for breach of contract as a result of Pinetree not completing the contract project within the time period specified in the contract?"

The trial judge found in his Amended Findings of Fact:

"22. Defendants, Robert F. Bell and Dorothy J. Bell and R. F. Bell, Inc., are not entitled to damages for any delay in the completion of the work. The initial delay in the completion of the construction was requested by Defendant, Robert F. Bell, while he and his wife were arranging for financing which made it dif-ficult for Pinetree Builders, Inc., to have subcontractors on the job as originally planned. With the delay being caused by Defendants, Robert F. Bell and Dorothy J. Bell, as well as by Defendant, Pinetree Builders, Inc., and for the further reason that the testimony and evidence fails to support the claim of lost profits claimed by Defendants, Robert F. Bell and Dorothy J. Bell and R. F. Bell, Inc., Defendants, Bells, are not entitled to damages for any alleged delay. Pinetree Builders, Inc., did not complete the contract but were prevented from doing so by Defendants, Robert F. Bell and Dorothy J. Bell."

The court expressed the following Conclusion of Law:

"7. The delay in completing the work as required by the contract between Defendants, Robert F. Bell and Dorothy J. Bell and Pinetree Builders, Inc., having been caused by Defendants, Robert F. Bell and Dorothy J. Bell, the Defendants, Robert F. Bell and Dorothy J. Bell, are not entitled to recover alleged lost profits; and there was no factual data available to furnish a basis for computation of possible lost profits even if the delay had been occasioned entirely by the Defendants, Pinetree Builders, Inc."

The Bells attack the trial judge's factual and legal conclusions. We need not concern ourselves with the issue of who was really at fault for the delay. Under the contract terms, the general contractor had an obligation to obtain extensions of time—even for delays caused by the owner—and liability flows from failure to comply with this requirement. No such extension was obtained in this case.

Article 3 of the Standard Form of Agreement, executed August 19, 1977, provided that work to be performed under the contract was to be commenced immediately upon execution of the agreement and substantial completion was to be achieved not later than 120 days thereafter, which would

---

**3.** Since the Missouri statute discussed above provides for punitive damages, as well as attorney fees, we would not consider cases inter-preting the Missouri statute to be directly in point with respect to the proper interpretation of our § 26-15-126(c), supra.

make the completion date December 17, 1977. It is undisputed that construction did not start until at least the latter part of September, 1977.

There was testimony concerning a change order which granted an extension of time for commencing work from August 19 to August 31. This extension would have extended the completion time by some 12 days, which would have made it December 29 instead of December 17, 1977. The Bells state, without citation to the record, that the building was completed on April 1 and that they asked at trial for delay damages through April 1. However, they also say in their brief, this time with citations to the record, that the building was substantially completed by March 15. While the evidence and the briefing is sufficient to establish that the building was not substantially completed until March 15, it is not sufficient to establish delay beyond that time.

Article 8 of the contract's General Conditions concerns itself with delays and extensions of time. Section 8.3.1 provides that if the contractor is delayed at any time in the progress of work by any act of the owner or architect, the *time shall be extended by a change order* for such reasonable time as the architect may determine. Section 8.3.2 provides that any *claim for extension of time shall be made in writing to the architect not more than 20 days after the commencement of the delay,* otherwise it shall be waived.[4] In essence, these two provisions contemplate that extensions of time may be granted by change order. However, any request for extension of time must be made by the contractor not more than 20 days after commencement of the delay or it will be deemed to have been

waived. At no time did Pinetree ever request an extension of time. Therefore, any right to such extension must be considered waived.

We recently considered similar contract language in *Quin Blair Enterprises, Inc. v. Julien Const. Co.,* supra at 597 P.2d 951–952, where we said:

"Paragraph 8.3.1 and 8.3.2, supra, make plain that Julien was required to request in writing any extensions of time to complete the contract, even if the delay was due to the owner's actions or neglect. It is evident from the record that Julien at no time requested in writing an extension of time to complete the contract. [Footnote.] We can see no reason why we should ignore these plain and unambiguous terms of the contract. They serve a plain and beneficial purpose when disagreement arises. If there is to be an extension of time, it should be in writing for all to see as contemplated by the contract terms. After competent parties have solemnly contracted, a court should exercise restraint in nullifying its terms and any other practice is dangerous, * * "

The Supreme Court of Oklahoma considered this issue when it said:

"The trial court committed reversible error in completely ignoring the portion of Article 18 of the 'General Conditions' of the prime contract involved herein that requires written application for any extension of the completion time provided for in that article, * * * " *Flour Mills of America, Inc. v. American Steel Bldg. Co.,* Okl., 449 P.2d 861, 875 (1968).

4. These two sections provide:

"8.3.1 If the Contractor is delayed at any time in the progress of the Work by any act or neglect of the Owner or the Architect, or by any employee of either, or by any separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in transportation, adverse weather conditions not reasonably anticipatable, unavoidable casualties, or any causes beyond the Contractor's control, or by delay authorized by the Owner pending arbitration, or by any other cause which the

Architect determines may justify the delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

"8.3.2 Any claim for extension of time shall be made in writing to the Architect not more than twenty days after the commencement of the delay; otherwise it shall be waived. In the case of a continuing delay only one claim is necessary. The Contractor shall provide an estimate of the probable effect of such delay on the progress of the Work."

## Amount of Damages

We have previously announced this measure-of-damage rule:

"The general measure of damages for breach of contract is the amount which will compensate the injured person for the loss which full performance of the contract would have prevented. * * * *" *Zitterkopf v. Roussalis*, Wyo., 546 P.2d 436, 438 (1976).

Section 8.2.1 of the General Conditions expressly provides that all time limits stated in the contract are of the essence of the contract.

■ Mr. Bell testified that he and his wife owned the equipment and building and leased the same back to a corporation, R. F. Bell, Inc., for the sum of $2,000 per month. He said they intended to open the business on January 1, 1978, and were prevented by the delay in construction from doing so until April 1, 1978. This delay, according to Mr. Bell, caused a loss of three months' rent at $2,000 per month, or a total of $6,000. However, as discussed above, the record shows that the building was substantially completed on March 15. It would appear, then, that March 15 was the first date on which the Bells could reasonably charge their corporation rent for the building. We find the evidence sufficient to prove a loss of two and one-half months of rent, or a rental loss of $5,000.

■ Mr. Bell further testified that it was contemplated that he and his wife would each draw a salary of $1,000 per month from the corporation. The sole source of income from the corporation, which was to pay their salaries, was from the operation of the Tastee Freez business. It was argued that because of the delay in the completion of the building, the Bells were unable to draw their salaries for the months of January, February and March of 1978. It appears from the transcript that the Bells—or at least Mr. Bell—expended considerable time during the first three months of 1978 overseeing the completion of construction and start-up of the restaurant. The fact that they chose not to pay themselves salaries during that time supports the trial court's implicit conclusion that the claim for lost salaries was simply a liquidated claim for lost profits. A claim for lost future profits must be based on "the best proof available as to amount of loss." *Wyoming Bancorporation v. Bonham*, Wyo., 563 P.2d 1382, 1385 (1977). The Bells' testimony that they had decided to draw a certain salary from their new business and that they had drawn the same salary from an earlier similar business is not the best proof available as to the amount of the loss. See, for example, the proof of lost profits discussed in *Smith Development Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 308 A.2d 477 (1973), concerning tortious interference with the construction of a McDonald's fast-food outlet.

We hold that the trial court erred in not awarding the Bells $5,000 in delay damages for lost rent. We affirm his denial of delay damages for lost salaries.

## Issue No. 2

■ The Bells next pose the following query:

"Did the trial court err in not awarding recovery in full to Appellants for landscaping and site work which Pinetree failed to complete under the terms of the contract and which Appellants completed at their expense?"

The contract between the Bells and Pinetree specified, "Construction of a Tastee Freez Store, Model 2100–B and completion of all site and landscape improvements . . . ."

The site and landscape improvements were not performed by Pinetree, thus necessitating the Bells' hiring of a greenhouse operator, Roger McKeehan, to make the site and landscape improvements. McKeehan testified that his bill for this work came to $3,368.75. He explained that this included $217 for "extras" that were not specified in the original contract plans. However, he also testified that he did not do $1,260 worth of work called for by the original contract plans. Other than the above-described omissions and extras, McKeehan explained that he performed the site and land-

scape improvements according to the original contract plans.

The trial judge awarded the Bells $1,206 "for landscaping which was not completed by Pinetree Builders, Inc." He did not elaborate on the derivation of this figure. On appeal, the Bells ask that they be allowed $3,168.75 for landscaping and site improvement, which is the difference between the McKeehan bill and the $217 worth of "extras" McKeehan performed.

We have previously indicated the necessity for parties to follow the terms and conditions of contracts entered into by them. Section 3.4.1 of the contract's General Conditions provides:

"If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within seven days after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may, after seven days following receipt by the Contractor of an additional written notice and without prejudice to any other remedy he may have, make good such deficiencies. In such case an appropriate Change Order shall be issued deducting from the payments then or thereafter due the Contractor the cost of correcting such deficiencies, including compensation for the Architect's additional services made necessary by such default, neglect or failure. Such action by the Owner and the amount charged to the Contractor are both subject to the prior approval of the Architect. If the payments then or thereafter due the Contractor are not sufficient to cover such amount, the Contractor shall pay the difference to the Owner."

The record does not reflect that such procedure was followed with reference to the landscaping and site work. Accordingly, we cannot find a basis for an award to Bells for damages resulting from Pinetree's default and neglect to carry out the landscape work in accordance with its contract obligation. Pinetree has not appealed the trial court's partial award in favor of the Bells, and we will not disturb it.

## Issue No. 3

The third issue urged by the Bells is the following:

"Did the trial court err in denying recovery of attorney fees and costs to Appellants from Pinetree and State Surety as required by the Labor and Material Bond, Performance Bond and Section 29–2–115, Wyoming Statutes, 1977?"

The cited statute provides:

"§ 29–2–115. Duty of contractor to defend action; liability of contractor to owner.

"In cases where a lien shall be filed under the provisions of this act, by any person other than a contractor, it shall be the duty of the contractor to defend any action brought thereon at his own expense, and during the pendency of such action the owner or agent may withhold from the contractor the amount of money for which said lien shall be filed, and in case of judgment being rendered against the owner or his property upon the lien, he shall be entitled to deduct from any amount due by him to the contractor the amount of such judgment and costs, and if he shall have settled in full with the contractor he shall be entitled to recover back from the contractor any amount so paid by the owner for which the contractor was originally liable."

The Bells argue that under this statute Pinetree is liable for the Bells' attorney fees.

The Bells also argue that State Surety is liable under the surety contract for attorney fees. Paragraph 2 of the Labor and Material Payment Bond issued by both Pinetree and State Surety provides:

"The above named Principal and Surety hereby jointly and severally agree with the Owner that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this

bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Owner shall not be liable for the payment of any costs or expenses of any such suit."

The Bells argue that the last sentence means that State Surety is liable for the Bells' attorney fees.[5]

State Surety, as appellee in this case, makes two arguments with respect to the Labor and Material Payment Bond. First, it argues that even if it is liable for the Bells' fees incurred in defending against Lamb, it is not liable for the Bells' cost in defending and prosecuting the numerous other claims involved in this case, i. e., the Bells' claim for lost profits asserted against Pinetree. State Surety urges that the Bells did not prove what portion of their attorney fees was due to defending against Lamb. Second, it is State Surety's position that the language "any costs or expenses of such suit" in the bond does not include attorney fees. Pinetree, as mentioned above, has neglected to bolster its position as an appellee by filing a brief.

The Bells also rely on the Performance Bond in addition to the Labor and Material Payment Bond for the proposition that State Surety must indemnify them for all costs of the contractor's default. However, the Bells point to no language in the Performance Bond—and we have found none—that could reasonably be construed as a promise to pay attorney fees should the contractor default. Unlike Lamb, the Bells do not argue entitlement to attorney fees under § 26–15–126, supra.

As mentioned in the introduction to this opinion, the Bells refused to pay Pinetree all of the money it was due under the contract. The trial judge cited this fact in denying the Bells attorney fees against Pinetree and State Surety.

We cannot agree with the district court's holding that the Bells' behavior precluded their recovery of attorney fees. The Bells refused to pay Pinetree's ninth application for payment dated August 1, 1978. The contract specified that Colorado Tastee Freez, Inc. would be the architect. Floyd Powell testified that he had been the construction superintendent for Colorado Tastee Freez during the relevant time. He went on to say that the work specified in the contract had never been completed to his satisfaction and that he had, therefore, disapproved the ninth application for payment. This testimony stands uncontradicted.

Articles 5 and 6 of the contract between the Bells and Pinetree provide that both progress payments and the final payment were to be submitted to Colorado Tastee Freez for approval before being paid by the Bells. Section 9.6 of the General Conditions specifies the conditions under which the architect may refuse to certify payment. As specified in Section 9.6.1, these conditions include: "reasonable evidence that the Work will not be completed within the Contract Time..." It is undisputed and borne out by the trial court's findings that Pinetree never did complete its work under the contract and that the Bells never accepted it. In fact, the request for the ninth payment came some seven months after the contract time for completion, when the opening of the restaurant had been delayed by some three months, causing financial injury to the Bells. Given these circumstances, the Bells were, under the contract, justified in refusing payment. Indeed, the trial court reduced the amount claimed as owing by Pinetree and offset most of the remainder with credits to which it found the Bells entitled.

Although the trial court may disallow attorney fees on the basis that such recov-

---

**5.** It appears that the Bells sell themselves short in not arguing that both Pinetree and State Surety are liable under the Performance Bond. Pinetree is the principal named in the bond and the quoted paragraph from the bond makes clear that both the principal and the surety agree to indemnify the owner. See, for example, *Frommeyer v. L. & R. Construction Co.*, 3 Cir., 261 F.2d 879, 880 (1958). However, the Bells have not made this argument and we restrict our consideration of their claim against Pinetree to consideration of § 29–2–115, supra.

ery would be inequitable, *Combs v. Walters,* supra; *Graves v. Burch,* supra, we find no evidence for such a conclusion with respect to the liability of Pinetree and State Surety for Lamb's lien foreclosure against the Bells.

This conclusion forces us to examine the Bells' claim for attorney fees. Specifically, we focus on the language of § 29-2-115, supra, which we read to dictate that Pinetree has the "duty" to defend Lamb's action against the Bells, "at its own expense," and Paragraph 2 of the Labor and Material Payment Bond, which we read to dictate that State Surety shall indemnify the Bells "for the payment of any costs or expenses" of the Lamb suit.

Wyoming adheres to the rule that attorney fees are not usually recoverable unless there is specific statutory authority therefor, or unless they are provided for by contract. *Werner v. American Surety Company of New York,* Wyo., 423 P.2d 86, 88 (1967); *Kvenild v. Taylor,* Wyo., 594 P.2d 972, 977 (1979).

We must, therefore, examine the word "expense" (used in the statute) and the words "costs" and "expenses" (used in the bond). Our prior case law is not definitive with respect to whether attorney fees are encompassed within these words. In *Board of Com'rs of Natrona County v. Board of Com'rs of Fremont County,* 40 Wyo. 144, 275 P. 102 (1929), we addressed the issue which asked which county was obligated to pay the fee of a special prosecutor hired to prosecute a criminal action which was initiated in Fremont County but tried in Natrona County. Under the relevant statute, Fremont County was liable for the "costs" of the prosecution and we held that the term should embrace the prosecutor's fee. We reasoned that each county should bear the full costs of its own criminal prosecutions. However, our review of cases in other jurisdictions persuades us that in the absence of special circumstances, the word "costs" generally does not include attorney fees, e. g., *Commonwealth v. Opara,* 240 Pa.Super. 511, 362 A.2d 305, 308 fn. 13 (1976); *Hayman v. Morris,* 37 N.Y.S.2d 884 (1942).

In *Conway v. Skidmore,* 48 Wyo. 73, 41 P.2d 1049, 1053 (1935), we were confronted with the issue of whether the term "expenses" embraces attorney fees. In dicta, we stated that "collection expenses" might be assumed to include a reasonable and necessary attorney's fee, but we decided the case on other grounds.

■ We conclude that under Wyoming law, the words "costs" and "expenses" may embrace attorney fees but do not necessarily do so.

Several federal cases are even more directly in point.

The Bells cite *Frommeyer v. L. & R. Construction Co.,* 3 Cir., 261 F.2d 879 (1958), fn. 5, a case strikingly similar to the present one. In *Frommeyer,* the sub-subcontractor occupies the position of Lamb, the subcontractor the position of Pinetree, and the prime contractor the position of the Bells. In *Frommeyer,* the prime contractor and subcontractor were involved in a dispute and neither paid a bill which the sub-subcontractor was entitled to. The sub-subcontractor thereupon filed suit against both. The subcontractor and a surety company had jointly issued a performance bond in favor of the prime contractor "conditioned on the performance of the subcontract free and clear of liens and indemnifying [the prime contractor] from loss, costs and damage by reason of [the subcontractor's] failure to do so." 261 F.2d at 880.

Upon being sued by the sub-subcontractor, the prime contractor and subcontractor each cross-claimed against the other. The prime contractor sought indemnity and attorney fees from the subcontractor, while the subcontractor pursued its original dispute with the prime contractor. The trial court gave judgment on the underlying dispute between the prime contractor and subcontractor and decreed that the subcontractor pay the prime contractor $5,000 in attorney fees to compensate the prime contractor for his defense of the sub-subcontractor's claim. The award of attorney fees was appealed, as well as other aspects of the case.

The Third Circuit acknowledged the general rule that attorney fees generally are neither a recoverable item of damage nor a taxable cost. The court then stated:

"But this case does not involve the above well-settled proposition. If, in our case above put, B is under obligation to hold A harmless from claims of C, but fails to do so, then A having defended himself against C's claim may recover, as part of his damages in a suit against B, what he has had to pay out because of B's failure to perform his contract. This includes what A has had to pay his lawyer as well as other expenses.

"This is a general rule and finds expression in New Jersey cases [footnote] and in federal decisions also. [Footnote.] See McCormick, Damages § 66 (1935).

"The district court was compelled to divide what had been paid out as attorney fees between that which was spent defending the [sub-subcontractor's] claim and that involving disputes between [the prime contractor and subcontractors]. * * *" 261 F.2d at 881.

We find the logic of *Frommeyer* compelling and believe it to be a fair representation of the law. A decade later the Third Circuit cited *Frommeyer* and said:

"The general rule, as usually stated, is that counsel fees and expenses incurred by an indemnitee in defense of a law suit can be recovered from the indemnitor if the defense is against the liability indemnified against * * *" *A. C. Israel Commodity Co. v. American-West African Line, Inc.*, 3 Cir., 397 F.2d 170, 172 (1968), *reh. den., cert. den.*, 393 U.S. 978, 89 S.Ct. 446, 21 L.Ed.2d 439.

In applying *Frommeyer* to a case involving a performance and payment bond, the Eighth Circuit said:

"Clearly [the surety company] instituted its action against the City in order to determine its liability under the bond as the result of Sanitary's failure to complete its work under the contract. We

believe the contract contemplates such an action. GC–29 by its plain terms is an indemnifying agreement. So viewed, there is sound authority that the indemnitee, the City, is entitled to recover from the indemnitors, as part of its damages, reasonable attorney fees which City incurred in defending a suit brought against it in reference to the matters against which it was indemnified. This is so even though the indemnity agreement does not specifically include or mention 'attorney fees.' * * * "[6] *City of Grandview, Missouri v. Hudson*, 8 Cir., 377 F.2d 694, 697–698 (1967).

State Surety places partial reliance on *Ranger Const. Co. v. Prince William County*, 4 Cir., 605 F.2d 1298 (1979), in which the surety was not held liable for attorney fees. In that case the contractor sued the owner for breach of contract while the contractor was still working on the construction project. The owner then terminated the contract, brought in the surety as a third party, and counterclaimed against both the contractor and the surety. The issues at trial were whether the owner was justified in terminating the contract, and, if so, the damages the owner was entitled to. The surety bond provided that if the owner declared the contractor in default, the surety had the right to complete the contract in accordance with its terms either by contracting with others or by collaborating with the owner in hiring others to complete the contract. In completing the contract under those circumstances, the surety "obligated itself to 'make available as Work progresses * * * sufficient funds to pay the cost of completion less the balance of the contract price; *but not exceeding, including other costs and damages for which Surety may be liable hereunder, the amount set forth in the first paragraph hereof.*' * * *" 605 F.2d at 1302. (The emphasis is in the original and the emphasized language was that relied on by the owner for his claim of entitlement to attorney fees.)

---

**6.** We should point out, however, that despite the language of this last sentence, the contract in Grandview did specifically provide indemni-

ty for lawsuits. The bond in our case also provides for the "payment of any costs or expenses of any such suit."

In light of this language and the issues presented at trial, the Fourth Circuit refused to allow the owner attorney fees against the surety under the indemnity rationale. The Fourth Circuit said:

"The [owner] recognized the difficulties confronted by it in seeking attorney's fees. . . . It seems to assume it can surmount the difficulty by construing the performance bond as an indemnity contract. [Footnote.] It likens the performance bond in this case to 'a personal liability insurance policy,' under which the insurance carrier 'has contracted to defend and pay any judgment arising out of specified contract.' An insured under such a policy is entitled, it observes, to recover attorney's fees incurred in defending a suit by a third-party within the coverage of the bond. But the attorney's fees being recovered in the situation instanced by the [owner] are not the fees incurred by the plaintiff in establishing a right to indemnity under the policy, but the fees incurred by the plaintiff in being forced to defend itself in a third-party suit by reason of the insurance company's failure to defend as it had agreed to do under the contract. The distinction between the two situations was concisely put by the court in *Key Savings & Loan Assn. v. Travelers Indemnity Co.* (1973) 32 Colo.App. 358, 513 P.2d 737, 740:

" 'In awarding the [attorney] fees the trial court relied on *National Union Fire Ins. Co. v. Denver Brick & Pipe Co.*, 162 Colo. 519, 427 P.2d 861. However, the fees awarded in that case to the obligee of the bond were fees incurred in defending an action to foreclose mechanics' liens which the bonding company was obligated to pay under its bond. The present action involves a dispute between two contracting parties over the obligations imposed by the contract. The attorney fees for the prosecution of such a suit are not recoverable.' [Footnote.]" 605 F.2d at 1303–1304.

■ Our own case law discussed above provides that the words "costs" and "expenses" may be read to include attorney fees, although they need not be so read.

The federal authorities just discussed suggest that in an indemnity situation the words "costs" and "expenses" should be read to include attorney fees. We agree with the federal case law. Under the terms of the Labor and Material Payment Bond, State Surety agreed to indemnify the Bells from claims by suppliers and contractors. We hold that the bond entitled the Bells to their attorney fees in defending the suit brought by Lamb. Recovery of attorney fees is there provided by contract. However, that is all the Bells are entitled to; they are not entitled to attorney fees for their legal battles with Pinetree. *Ranger Const.*, supra; and the last paragraph of the quoted excerpt from *Frommeyer*. Nor have the Bells cited any authority or cogent argument why they should have a right to collect from State Surety the attorney fees it expended in its fight against State Surety.

Everything we have said about the liability of State Surety to the Bells for attorney fees also applies to Pinetree's liability. Section 29–2–115, supra, appears to command that Pinetree indemnify the Bells against Lamb's claim. In view of the authorities we have discussed, we do not see how we can distinguish the statutory command that the contractor defend "at his own expense" from the bond's language that the owner shall not be liable "for the payment of any costs or expenses of any such suit."

Having determined that both Pinetree and State Surety are liable for the Bells' legal expenses in defending against Lamb's claim, we must now face the difficult question of how the Bells' total attorney fees are to be apportioned between their defense of Lamb's claim and their disputes with Pinetree and State Surety.

The Bells' Exhibits G, H and I, introduced at trial, establish that the Bells incurred several thousand dollars in attorney fees in conjunction with the trial and preparation of the total case. The bills are itemized, but we think that only a very few charges, such as a charge of $45.00 for "Review of Complaint in Lamb Construction Company

case and preliminary research on validity of lien," are unambiguously expenses incurred solely as a result of Lamb's claim. The trial testimony concerning these exhibits is similarly unenlightening. The Bells' Exhibit G was introduced as a bill from Richard A. Stacy "for the depositions which were taken." Mr. Bell testified that the charges resulted from Lamb's action filed against him. The bill is for $506.25, almost all of which appears to be deposition expenses. Three depositions are mentioned: those of Bell, Webb and Baringer. The deposition of Baringer, a Lamb employee, dealt almost exclusively with the Lamb claim. However, the depositions of Bell and Webb dealt largely with matters extraneous to the dispute between the Bells and Lamb. The bill does not apportion costs among the three depositions. The Bells' Exhibit H is a multi-thousand-dollar bill from Frank J. Jones. Although Bell testified that the bill resulted from the Lamb claim, it is apparent that except for the $45 item already described, almost all of the itemized charges encompass the Bells' disputes with Pinetree and State Surety, as well as their dispute with Lamb. For example, charges such as "telephone charges," "travel expense," "research," "complete research and prepare drafts of brief" and "attendance at trial" are not apportioned between Lamb's claim and other aspects of the case. The Bells' Exhibit I, a several-hundred-dollar bill from Sigler and Pauli, is also not apportioned among the underlying claims. Also, Bell testified that the Sigler and Pauli bill resulted from "the breach of this contract" and the Bells pressed many breach-of-contract claims as well as the claim that Pinetree and State Surety breached their obligation to protect the Bells from claims by subcontractors.

We are not in a position to apportion these legal fees between the cost of defending against Lamb's claim and the cost of pursuing the other actions.

State Surety asserts without citation that under Wyoming law fees must be proved. In the instant case, unlike *Wallace v. Casper Adjustment Service*, Wyo., 500 P.2d 72 (1972), no issue is made of the reasonableness of the fees and the times spent by the attorneys are well documented. In *Combs v. Walters*, supra, we said that at least in a collection there must be some evidentiary base for a finding in a determination of a reasonable attorney fee. In the instant case there is quite a bit of evidence concerning the attorney fees, the times spent by the attorneys, and work done by them. In *Combs*, we stated that trial courts are particularly competent to fix reasonable attorney fees.

As the Third Circuit said in *Frommeyer*, supra:

"The district court was compelled to divide what had been paid out as attorney fees between that which was spent defending the [sub-subcontractor's] claim and that involving disputes between [the prime contractor and subcontractors]. * * * " 261 F.2d at 881.

The case is remanded for such an apportionment by the trial court.

Case No. 5330 is affirmed.

Case No. 5331 is reversed in part and remanded for disposition consistent with this opinion.